IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| United States of America, | ) | 6:24-cr-00466-JDA-1 |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| | ) | |
| Howard Leroy Schulman, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on a motion for compassionate release by Howard Leroy Schulman ("Schulman") pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). [Doc. 40.] Schulman is serving a 55-month sentence for Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). [Doc. 29 (sealed).] Because the applicable Sentencing Commission policy statement, *see* U.S.S.G § 1B1.13, and the 18 U.S.C. § 3553(a) factors do not support a further reduction of Schulman's sentence, the Court denies his motion.

## BACKGROUND

On July 8, 2024, Schulman pled guilty to Count 1 of the Information charging Possession of Child Pornography pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (the "instant conviction"). [Docs. 2, 4.] On September 16, 2024, Schulman was sentenced to 55-months' imprisonment to be followed by a term of supervised release for life. [Doc. 35.] On June 8, 2026, Schulman filed a motion for reduction in sentence. [Docs. 40.] The Government opposes the motion and Schulman filed a reply. [Docs. 42, 46.] The matter is now ripe for consideration.

## **LEGAL STANDARD**

The United States Court of Appeals for the Fourth Circuit has held that a court "may not modify a term of imprisonment once it has been imposed[.]"   18 U.S.C. § 3582(c); *see United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).   But "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception to this rule is when the modification is "expressly permitted by statute."   18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Title 18, United States Code, Section 3582(c)(1)(A)(i), commonly known as the "compassionate release" provision, provides a statutory vehicle to modify a defendant's sentence.  *United States v. Wiggins*, No. ELH-13-512, 2020 WL 4436373, at *2 (D. Md. Aug 3, 2020).  Section 3582 was adopted as part of the Sentencing Reform Act of 1984. *Id*.  The statute originally permitted a court to alter a sentence only at the BOP's request. *See United States v. McCoy*, 981 F.3d 271, 274 (4th Cir. 2020), abrogated on other grounds by *Rutherford v. United States*, 146 S.Ct. 1320 (2026).

In December 2018, Congress significantly modified the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA").  *See* Pub. L. 115-391, 132 Stat. 5194 (2018).  This Court has held that, as amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a sentence of imprisonment

> upon motion of the Director of BOP, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the BOP to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever occurs first.

*Wiggins*, 2020 WL 4436373, at *2 (cleaned up).  And so, once a defendant has exhausted his or her administrative remedies, the defendant may petition this Court directly for compassionate release.  *Id*.

Under Section 3582(c)(1)(A), the court may modify a defendant's sentence if, "after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable," it finds that:

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission ....

*Wiggins*, 2020 WL 4436373, at *3. And so, to be entitled to relief under Section 3582(c)(1)(A)(i), the defendant must show that: (1) "extraordinary and compelling reasons warrant a reduction of his sentence"; (2) "the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction"; and (3) "the sentence modification is consistent with the policy statement issued by the Sentencing Commission in U.S.S.G. § 1B1.13."  *Id*. (internal quotation marks omitted).  The United States Sentencing Commission ("the Commission") is charged with defining "what should be considered extraordinary and compelling reasons for sentence reduction" under 18 U.S.C. § 3582(c)(1)(A).  28 U.S.C. § 994(t).

**DISCUSSION**

**Exhaustion of Remedies**

Before a court may consider a defendant's motion for compassionate release, the defendant must have completed the initial step of requesting that the BOP bring a motion on his behalf.  The defendant may file a motion with the court: (1) after fully exhausting all administrative rights to appeal; or (2) after the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier.  *See United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); 18 U.S.C. § 3582(c)(1)(A).

Schulman submitted a request for a sentence reduction to the Warden FCI Butler, and his request was denied.  [See Doc. 40-1 at 2–5; Doc. 40-2 at 2.] The Government does not contest that Schulman met the exhaustion requirement by filing a request with the warden of his facility.  [Doc. 42 at 3]; *see* 18 U.S.C. § 3582(c) (1)(A) (allowing for the filing of a motion with the court when administrative options are exhausted or 30 days pass, "whichever is earlier"). Because the Government concedes that Defendant has exhausted his administrative remedies, the threshold inquiry is whether Defendant has demonstrated that an "extraordinary and compelling reason" warrants a reduction of his sentence.  *United States v. Adjaj*, No. 3:22-CR-00240-AN-1, 2024 WL 358167, at *4 (D. Or. Jan. 30, 2024).

**Whether There is an Extraordinary and Compelling Reason for Reduction**

With respect to the November 1, 2023, amendments to the Sentencing Guidelines, the Commission included a policy statement addressing motions for sentence reduction under 18 U.S.C. § 3582(c)(1)(A) when a defendant alleges that "extraordinary and compelling" reasons warrant a reduction.  *See United States Sentencing Guidelines*

4

*Manual* Supp. App. C, amend. 814 (2023).  The revised policy statement for U.S.S.G. § 1B1.13(b) provides that an "extraordinary and compelling" reason warranting compassionate release can exist under any of the following circumstances, each of which includes detailed requirements and caveats:

> (1) Medical Circumstances of the Defendant
>
> (2) Age of the Defendant
>
> (3) Family Circumstances of the Defendant
>
> (4) Victim of Abuse
>
> (5) Other reasons
>
> (6) Unusually Long Sentence

U.S.G.G. § 1B1.13(b).

Section 1B1.13(b)(1) of the recently revised Policy Statement identifies four circumstances under which a defendant's medical condition may provide an extraordinary and compelling reason for relief.  *See* U.S.S.G. § 1B1.13(b)(1)(A)–(D).  First, under § 1B1.13(b)(1)(A), "a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory)," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia," may provide an extraordinary and compelling reason for relief.  Second, under § 1B1.13(b)(1)(B), an extraordinary or compelling reason may exist if the defendant is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of ... aging," and such condition or impairment "substantially diminishes" the defendant's ability to care for himself.  Third, under § 1B1.13(b)(1)(C), an extraordinary or compelling reason may exist

5

if "[t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." Finally, under § 1B1.13(b)(1)(D), relief may be warranted if:

> (i)     the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;
>
> (ii)    due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and
>
> (iii)   such risk cannot be adequately mitigated in a timely manner.

It is Schulman's burden to establish that his medical conditions create an extraordinary and compelling reason for compassionate release. *See United States v. Newton*, 996 F.3d 485, 488 (7th Cir. 2021); *see, e.g., United States v. Tucker*, No. 3:09-502-JFA, 2021 WL 3886416, at \*3 (D.S.C. Aug. 31, 2021). Upon review, the Court finds that Schulman has failed to carry his burden.

**The Court Finds no Extraordinary and Compelling Reason for Reduction**

Courts have consistently recognized that the medical circumstances category under § 1B1.13(b)(1) is not exhaustively defined, and the catchall provision in the Sentencing Guidelines recognizes that judges are in a unique position to determine what circumstances or combination of circumstances are sufficiently extraordinary and compelling to warrant a reduction in sentence. *United States v. Smith*, 762 F. Supp. 3d

6

1249 (S.D. Fla. 2024). Importantly, courts have also held that chronic conditions that can be managed in prison are not a sufficient basis for compassionate release—it is not enough that a defendant suffers from chronic conditions he is not expected to recover from. *United States v. DeMille*, 465 F. Supp. 3d 1144 (D. Or. 2020). This principle is directly relevant to chronic inflammatory demyelinating polyneuropathy ("CIDP"), which is a chronic but potentially manageable condition, requiring that a defendant raising CIDP would need to demonstrate that the condition substantially diminishes the ability to provide self-care within the prison environment or that the BOP is failing to provide adequate specialized care.

Schulman appears to seek relief under § 1B1.13(b)(1)(B) and (C). Schulman, age 71, alleges that in addition to the typical medical conditions elderly BOP inmates suffer from, such as high blood pressure and high cholesterol, he also suffers from CIDP and atrial fibrillation. [Doc. 40 at 3.] Shulman argues the BOP has failed to provide him with appropriate treatment for his CIDP and, as a result, his condition has significantly deteriorated since his incarceration. [*Id*.] He expects to be in a wheelchair soon if his condition is not appropriately addressed. [*Id*.] Schulman also argues that his new onset atrial fibrillation requires treatment by a cardiologist and additional imaging and testing to ensure appropriate treatment. [*Id*. at 5.] Because of Shulman's rapid deterioration due to his CIDP, his ability to  manage his atrial fibrillation will also be affected. [*Id*. at 5–6.] Schulman contends his CIDP alone would make him medically complex, but with the addition of his atrial fibrillation diagnosis, his ability to appropriately treat his conditions is nearly impossible within the confines of BOP. [*Id*. at 6.] Schulman submits that his unique

condition is clearly what U.S.S.G. § 1B1.13(b)(1)(B)(i) and (iii) and U.S.S.G. § 1B1.13(b)(1)(C) contemplates.

The Government concedes Shulman suffers from CIDP, which is an autoimmune disorder, and that it is a serious medical condition. [Doc. 42 at 3.] The Government also points out that the BOP is aware of Shulman's atrial fibrillation and it is being treated. [*Id.* at 3 n.1.] The Government additionally concedes that some error, perhaps in scheduling, caused unnecessary delays in a neurology consult to treat CIPD, and that there have been challenges in providing certain medicines. [*Id.* at 4.] However, he was seen at the Duke Neuroscience Center on January 7, 2026, and has a follow up visit scheduled. [*Id.* at 6.] The Government contends "[a] review of the medical records shows that Petitioner is regularly seen by medical staff and has received adjustments in medication, treatments for sinus maladies, treatments for shoulder pain, MRIs (related to back pain from old cycling accidents and for persistent cough), and many other interventions." [*Id.* at 4.] Thus, the Government opposes release.

Upon considering Schulman's arguments for compassionate release, the Court notes that, under § 1B1.13(b)(1)(B)(i), compassionate release is available when the defendant is suffering from a serious physical or medical condition. Courts have held that conditions that are adequately treated and monitored within the correctional facility do not satisfy this standard. In *United States v. Gotti*, the court denied compassionate release where the defendant's heart and lung conditions were adequately treated and monitored, finding he had not shown a serious physical or medical condition that substantially diminished his ability to provide self-care within the environment of the correctional facility. *States v. Gotti*, 433 F. Supp. 3d 613 (S.D.N.Y. 2020). Similarly, in *United States v. Garcia*,

8

the court found that conditions including unstable angina, non-obstructive coronary artery disease, hyperlipidemia, and aortic stenosis were not severe enough to warrant compassionate release where the defendant was receiving care for each condition and could treat acute pain with prescribed medication or by seeking medical attention.  758 F. Supp. 3d 47 (E.D.N.Y. 2024).

Under § 1B1.13(b)(1)(B)(iii), compassionate release is available when the defendant is experiencing a serious deterioration in physical or mental health because of the aging process.  Whether a defendant meets this standard is a fact-intensive analysis. *See Garcia*, 758 F. Supp. 3d at 57 (denying compassionate release where the defendant's cardiac conditions were not severe enough to qualify under either the terminal illness or serious deterioration standards, and where defendant was receiving adequate care for all cited conditions); *United States v. Rodriguez-Gonzales*, 492 F. Supp. 3d 741 (N.D. Ohio 2020).

Under § 1B1.13(b)(1)(C), compassionate release is available when the defendant is suffering from a serious physical or medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which the defendant is not expected to recover.  Courts have consistently denied relief where medical records show that the defendant's condition is well controlled with medications or that the defendant is receiving adequate care within the facility.  In *United States v. Mollica*, the court denied compassionate release where the defendant's hypertension, anxiety, and migraines were well controlled with medications and did not substantially limit her ability to provide self-care in a prison setting.  640 F. Supp. 3d 1209 (N.D. Ala. 2022).  Likewise, in *Garcia*, the court denied relief under this provision because

9

the defendant's submission and medical records reflected that he was receiving care for each of his cited conditions. *Garcia*, 758 F. Supp. 3d at 57. In summary, compassionate release under § 1B1.13(b)(1)(B)(i) and (iii) and (C) requires a showing of a serious medical condition or serious age-related deterioration that substantially diminishes the defendant's ability to provide self-care within the correctional environment and from which recovery is not expected—conditions that are adequately treated or managed within the facility will generally not satisfy these standards.

The Court has reviewed Schulman's medical records [Doc. 45 (sealed); Doc. 45-1 (sealed); Doc. 45-2 (sealed)] and finds Schulman is receiving adequate care within the facility. As noted by Schulman, he was being seen by physicians in the BOP, but a request for an offsite neurology consultation placed in November 2024, when he first arrived, slipped through the cracks. [Doc. 45-1 at 39.] Between the time of the request and the actual consult on January 7, 2026, Schulman was seen on several occasions by BOP medical staff and determined to be compliant with the treatment plan, in a usual state of health, able to complete his activities of daily living, and able to function in a correctional environment. [*Id*. at 24.] All his medications, except for Efgartigimod, were continued, and his neuropathy was determined to be stable. [*Id*.]

On May 22, 2025, Schulman was seen with anterior and posterior thigh pain bilateral of unknown cause. [*Id.* at 60.] It was noted that at that time, other than pain, he had no functional impairments. [*Id*.] On July 17, 2025, treatment notes indicate Schulman was seen with complaints of low back pain with bilateral radiculopathy that had increased over the past four months. [*Id.* at 45.] The treatment notes indicate he had been seen

by PT/neurology and indicated an updated EMG/NCV was not indicated as it would not change his treatment plan.  [*Id*.]

On January 7, 2026, Schulman was seen at Duke Neuromuscular Clinic by neurologist Dr. Shruti Mukund Raja for an initial consultation.   [Doc. 45-2 at 175.] Treatment notes indicate as follows:

> Mr. Schulman is a left-handed 71 [year old male] who presents for evaluation of bilateral foot drop in context of CIDP was in good neurologic health until approximately 5 years ago when he began to notice difficulty stepping in and out of a bathtub. He also noticed some dragging of his toes. Approximately 6 months prior to seeing care, he began to notice a decline in his performance while bicycling, specifically reduced speed of uphill pedaling. At the time he originally sought care, he was noting only distal lower extremity symptoms and this has remained the case. He denies proximal lower extremity involvement and any involvement of the upper limbs. He sought evaluation locally in Greenville and was evaluated by multiple providers including a general practitioner, orthopedist and rheumatologist at PRISMA Health and BonSecours before being referred to a neurologist. After extensive testing including multiple EMGs and laboratory evaluations, he was given a diagnosis of Multifocal Motor Neuropathy with Conduction Block and initiated therapy with IVIG. The diagnosis was subsequently revised to Chronic Inflammatory Demyelinating Polyneuropathy.
>
> IVIG was continued at unknown dose for 3.5 years with stabilization of motor symptoms. He reports that he was driving with adaptive strategy, using bilateral AFOs. In May 2024, he noticed loss of ability to walk longer distances because of increased weakness in the feet causing gait instability and overuse of the hips. He transitioned from IVIG to efgartigimod prefilled syringe in June/July 2024 and noticed significant improvement with the initial dosing. In October 2024, he entered the federal facility at Butner and was continued on efgartigimod. By December 2024, he was noting progression of symptoms such that it was no longer possible for him to ambulate in the recreation yard.

11

> For the duration of 2025, he has not been able to ambulate well and pretty much stayed away from walking in the recreation yard. He wears his bilateral AFOs at all times but this has not improved the walking. He noted no involvement of the upper extremities over this time period. In Fall 2025, he began having difficulty with palpitations, tachycardia, and dyspnea when climbing stairs. He was diagnosed with atrial fibrillation in November 2025 and initiated on anticoagulation with apixaban.
>
> At present, Mr. Schulman is not convinced he is benefiting from the efgartigimod.

[*Id*. at 175–76.]  On a review of systems, Schulman was noted to have reduced bulk and tone below the knees with 5/5 strength.  [*Id*. at 178.]  Laboratory study results showed "[d]istal axonal sensory neuropathy with active and chronic right L5-S1 radiculopathy. No findings to support acquired demyelination" [*id*.], meaning that Schulman has two distinct but potentially overlapping nerve issues in the lower body: a general nerve-ending weakness and a pinched nerve in the lower back.  *See* Misra UK, Kalita J, Nair PP. Diagnostic approach to peripheral neuropathy. Ann Indian Acad Neurol. 2008 Apr.-Jun.;11(2):89-97  (https://pmc.ncbi.nlm.nih.gov/articles/PMC2771953/),  last seen June 29, 2026.

After the evaluation, Dr. Raja noted the following assessment and plan:

> Based on his history, examination and electrodiagnostic studies performed today, it is not clear if his original presentation was consistent with CIDP. At present, clinical examination and electrodiagnostics are consistent with a distal sensorimotor axonal neuropathy and active lumbar radiculopathy, both of which would explain his distal lower extremity weakness and sensory loss. His examination is also concerning for an element of cervical myelopathy given the pathologic reflexes and preserved reflexes in the bilateral lower extremities. At this time, I am recommending additional evaluation including vitamin B12, vitamin D, copper and zinc levels and MRI of the cervical spine.

[*Id*. at 178.]  Dr. Raja recommended a follow-up appointment, either in person or by video, in four months to review lab evaluations for neuropathy and myelopathy with Vitamin B12, Vitamin D, zinc and copper; an MRI cervical spine without contrast; and prior imaging. [*Id*. at 179.]

I have no doubt that Schulman, who has the burden of showing the existence of "extraordinary and compelling reasons" to reduce his sentence, has established that he suffers from a plethora of serious, debilitating, and progressive medical conditions. However, he has not shown that he has a terminal illness or a serious physical or medical condition that has substantially diminished his ability to provide self-care within the environment of a correctional facility.  Because the BOP is actively providing Schulman with the specialized care he needs, he is unable to meet his burden under § 1B1.13(b)(1)(C).  *See United States v. Boulder*, No. 3:15-CR- 30032-RAL, 2024 WL 165287, at *5 (D.S.D. Jan. 16, 2024) (denying a defendant's motion for compassionate relief where, as here, her medical records reflect she "is receiving frequent and thorough medical attention"), *aff'd*, No. 24-1162, 2024 WL 3561559 (8th Cir. Jan. 31, 2024).  Based on the evidence presently available, the Court finds that the BOP is providing defendant with the specialized medical care that he needs.  Since his arrival at Butner, the BOP has provided defendant with consistent medical care by (1) working to find available prescription medications that meet defendant's needs; (2) issuing specialist referrals; (3) continually consulting with defendant during medical visits regarding his health issues while awaiting referral processing; and (4) scheduling specialist appointments.  Though the process has undeniably been long, the BOP has taken affirmative steps to secure the specialized care that Schulman needs.  *See Adjaj*, 2024 WL 358167, at *5.

13

Additionally, Schulman does not assert, nor is there any evidence to suggest, that he is suffering from a terminal illness, *see id*. § 1B1.13(b)(1)(A), or that his ability to care for himself is "substantially diminishe[d]" by a "serious physical or medical condition," "serious functional or cognitive impairment," or his age, *id*. § 1B1.13(b)(1)(B). And there is no basis on which to conclude that Schulman "is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." *Id*. § 1B1.13(b)(1)(C). Thus, the Court finds that Schulman has failed to meet his burden and, therefore, his motion is denied.

Courts considering defendants facing similar or worse deteriorations in their physical health than those suffered by Schulman tend to find that such conditions do not constitute extraordinary and compelling circumstances. *See, e.g., United States v. Amuso*, No. 90-cr-446, 2023 WL 5153425, at *3 (E.D.N.Y. Aug. 10, 2023) (finding no extraordinary and compelling reasons based on the defendant's health conditions where "medical records reflect that the BOP is managing [defendant's] medical conditions adequately by providing him with medications, x-rays, and medical appointments upon his request"); *United States v. Borelli*, No. 84-cr-63 (LAP), 2021 WL 2228075, at *3 (S.D.N.Y. June 2, 2021) (denying compassionate release where defendant "offered no indication that his medical conditions cannot be managed—or, for that matter, are not already well controlled—through BOP-provided medical care"); *United States v. LoCascio*, No. 90-cr-1051, 2020 WL 12719849, at *2, *4–6 (E.D.N.Y. July 17, 2020) (denying compassionate release to an 87-year-old defendant who had served at least 10 years in prison and who suffered an age-related deterioration in physical health, where

14

BOP was able to "manage" the defendant's chronic kidney disease, coronary artery disease, and heart failure that left him in "chronic pain, dependent on oxygen and confined to a wheelchair"); *United States v. Castillo*, No. 03-cr-979 (KMW), 2023 WL 2262881, at *1-3 (S.D.N.Y. Feb. 28, 2023) (finding 65-year-old defendant who had spent 19 years in prison did not show "extraordinary and compelling" reasons despite suffering heart attack, enlarged prostate, eye problems, and ongoing heart disease).  While Schulman has established that he suffers from a plethora of serious, debilitating, and progressive medical conditions, he has not shown that he has a terminal illness or a serious physical or medical condition that has substantially diminished his ability to provide self-care within the environment of a correctional facility.  Accordingly, the Court denies Shulman's request to reduce his sentence based on a serious physical condition.

**The Section 3553(a) Factors Weigh Against Reduction**

Even if the Court found compelling reasons to reduce Hunter's sentence, the Section 3553(a) factors weigh against reduction.

As an initial matter, the Court finds that the "nature and circumstances of the offense" weighs against reducing Schulman's sentence.  Schulman utilized online chat platforms such as Chat-Avenue, Snapchat, and Telegram to communicate with individuals who were under the age of 18 and sometimes between the ages of 14 to 16 years old.  Schulman's phone contained 18 picture files that contained at least 72 images of prepubescent minors and at least ten (10) images of minors under the age of 12 that are considered child pornography.  Schulman had one (1) video of a prepubescent female and male, who were between the ages of 10 and 12, engaged in a sex act.  [*See* Doc.29 ("PSR") ¶¶ 14-15.]  He committed a serious crime by abusing minors using the internet.

15

Schulman was not just looking at pictures, but rather was employing minors to engage in sexually explicit conduct for his own gratification.

Similarly, the Court finds Schulman's history and characteristics weigh against a sentence reduction.  On July 8, 2024, the Schulman was arrested and made his initial appearance.  [*Id*. ¶ 4.]  Schulman was released on a $25,000 unsecured bond with standard conditions of pretrial supervision. [*Id*.]  On July 29, 2024, a petition for warrant was requested advising that the defendant failed to refrain from viewing sexually explicit material and has violated the rules of the Computer Internet Monitoring Program.  [*Id*. ¶ 6.]  Schulman searched and viewed erotic stories that involved minors engaging in sexual activity.  Additionally, on July 13, 2024, Schulman received a picture message from a male that contained an image of male genitalia.  Schulman admitted to deleting content from his phone, and it was discovered his website browser was set to incognito mode in an effort to circumvent the monitoring software and and/or the device settings. [*Id*.]  Apparently, being arrested and released on special conditions directed to those facing sex-offender charges was not enough to deter Schulman from engaging in further criminal activity.

Schulman has served approximately 19 months of his 55-month sentence, or approximately 35% of his sentence.  Thus, the Court finds that the factors considering the promotion of respect for the law and just punishment weighs against reducing Schulman's sentence.  *See United States v. Thompson*, 984 F.3d 431, 434 (5th Cir. 2021) (noting that compassionate release is generally granted only "for defendants who ha[ve] already served the lion's share of their sentences").

Schulman provided no evidence of participation in rehabilitation efforts while incarcerated.  Even if he had, the Court could not overlook the severity of his continued engagement in criminal activities while on bond and his complete disregard for the laws, *See United States v. Davis*, No. 21-6960, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022).

## CONCLUSION

For the reasons stated above, the Court finds Schulman has failed to show extraordinary and compelling reasons supporting a reduction in sentence.  Based on the foregoing, and considering the relevant § 3553(a) factors, the Court finds that even if the threshold requirements of compassionate release were met—and the Court finds they were not—the Court would not grant Schulman's motion for compassionate release based on the present record before the Court.  Thus, it is hereby ORDERED that Schulman's motion for compassionate release [Doc. 40] is DENIED.

IT IS SO ORDERED.

s/ Jacquelyn D. Austin
United States District Judge

June 30, 2026
Greenville, South Carolina

## NOTICE OF RIGHT TO APPEAL

The parties are hereby notified of the right to appeal this order pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.